IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-00301-REB-NYW

JAMES ROGER DUNCAN,

    Plaintiff,

v.

KEVIN MILYARD, Warden, and
JAMES FALK, Warden,

    Defendants.

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Magistrate Judge Nina Y. Wang

This matter comes before the court on Defendants Kevin Milyard and James Falk's (collectively, "Defendants" or "Wardens") Motion for Summary Judgment (or "Motion"). [#147,[1] filed October 21, 2016]. The undersigned Magistrate Judge considers the Motion pursuant to 28 U.S.C. § 636(b), the Order Referring Case dated January 27, 2016, [#94] and the memorandum dated October 21, 2016 [#148]. The undersigned concludes that oral argument would not materially assist in the resolution of this matter. Accordingly, upon careful review of the Motion and associated briefing, the applicable case law, and the entire case file, this court respectfully **RECOMMENDS** that the Motion for Summary Judgment be **GRANTED**.

---

[1] Where the court refers to the filings made in Electronic Court Filing ("ECF") system in this action, it uses the convention [#___] and uses the page number as assigned by the ECF system, except when citing from the transcript of a deposition. When citing the transcript of deposition, the court uses the ECF docket number, but cites to the page and line numbers as assigned in the original transcript.

**PROCEDURAL HISTORY**

Plaintiff James Roger Duncan ("Plaintiff" or "Mr. Duncan") is an inmate currently in the custody of the Colorado Department of Corrections ("CDOC") and housed at Sterling Correctional Facility ("SCF"). On January 31, 2014, Mr. Duncan initiated this action *pro se* by filing a prisoner complaint in which he sued former governor of Colorado Bill Ritter, Jr.;[2] current governor of Colorado John Hickenlooper; Wardens Kevin Milyard and James Falk; CDOC Executive Director Rick Raemisch; and a CDOC case manager Jim Lueck for allegedly violating his constitutional rights by exposing him to contaminated drinking water while at SCF. [#1]. As interpreted by Magistrate Judge Boyd N. Boland, *see* [#66 at 3-4], Plaintiff's Complaint asserted three claims for relief pursuant to 42 U.S.C. § 1983: (1) violations of his First, Eighth, and Fourteenth Amendment rights by Defendants Falk and Lueck; (2) violations of his Eighth Amendment and equal protection rights by Defendants Falk and Milyard; and (3) violation of his Eight Amendment rights by Defendants Falk, Milyard, and Governor Hickenlooper because they knew of the contaminated water but were deliberately indifferent to it. [#1].

On May 12, 2014, Defendants Hickenlooper, Raemisch, Milyard, Falk, and Lueck moved to dismiss Plaintiff's Complaint in its entirety pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. [#32]. Judge Boland recommended dismissal of Mr. Duncan's claims for two reasons: (1) the Eleventh Amendment barred any claims for retroactive monetary relief against the named Defendants in their official capacities; and (2) Plaintiff failed to allege sufficient facts to support his three constitutional claims. *See* [#66]. The presiding judge, the Honorable Robert E. Blackburn, adopted the Recommendation in its entirety on December 11, 2014. [#67]. Accordingly, the Clerk of the Court entered Final Judgment in favor of Defendants Hickenlooper, Raemisch, Milyard, Falk, and Lueck and against Plaintiff, and

---

[2] Former Governor Bill Ritter, Jr. was dismissed from this action on September 8, 2014. [#59].

dismissed Plaintiff's Complaint. [#68]. Mr. Duncan filed Notices of Appeal on January 28, 2015. [#76; #79].

## The Appeal

The United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") affirmed in part and reversed in part the District Court's ruling, and remanded for further proceedings. *See* [#91]. First, the Tenth Circuit held that Mr. Duncan failed to adequately develop his First, Fifth, and Fourteenth Amendment claims on appeal; thus, the Tenth Circuit addressed only the dismissal of Plaintiff's Eighth Amendment claim. [*Id.* at 3 n.1]. In doing so, the Tenth Circuit concluded that Plaintiff alleged that the contaminated drinking water at SCF exposed him to a substantial risk of serious harm, satisfying the first prong of the deliberate indifference standard. [*Id.* at 8-9]. As to the subjective prong, the Tenth Circuit held that Plaintiff failed to allege that Defendants Hickenlooper, Raemisch, and Lueck knew of the substantial risk of harm the contaminated water posed to Plaintiff, yet disregarded that risk. *See* [*id.* at 9-10, 12]. Accordingly, the Tenth Circuit affirmed the District Court's dismissal of Mr. Duncan's Eight Amendment claim as to these Defendants.

The Tenth Circuit reached a different conclusion as to Wardens Milyard and Falk. [*Id.* at 11]. The Tenth Circuit held that Plaintiff sufficiently alleged that Wardens Milyard and Falk knew about the polluted water and the serious health risks associated with drinking SCF's water (based on 2008 and 2012 City of Sterling notices of elevated levels of uranium and trihalomethanes), but failed to abate that risk. [*Id.*]. Thus, the Tenth Circuit reversed and remanded Mr. Duncan's Eighth Amendment claim for further proceedings before the District Court to determine the Wardens' liability, if any. [*Id.* at 11-12].

On Remand

The Mandate issued on December 17, 2015. [#92]. Pursuant to the undersigned's Order [#96], the Wardens filed their Answer to Mr. Duncan's Complaint on February 9, 2016. [#98]. On February 22, 2016, the undersigned held a Status Conference and set a pre-trial schedule, including a deadline for discovery and for filing dispositive motions.[3] *See* [#99]. This court extended the discovery deadline to September 6, 2016, and the dispositive motions deadline to October 7, 2016, pursuant to the Wardens' request. *See* [#129; #132]. This court later extended the dispositive motions deadline to October 21, 2016—the date the Wardens filed their Motion for Summary Judgment. [#144; #146; #147].

On September 13, 2016, the undersigned issued an Order on Plaintiff's (1) Motion to Objected To; Defendants Responses to Plaintiff First Request for Productoion of Documents ("Plaintiff's Motion to Compel") [#116]; (2) Motion to Show that Expert Witness Not Quifyed and Motion in Limine ("Motion to Exclude") [#119]; and (3) Motion for Appointment of Counsel [#121]. *See* [#137]. By that Order, this court denied Mr. Duncan's Motion to Compel, but ordered the Wardens to certify that they had provided Mr. Duncan with all responsive documents to his Requests for Production Nos. 1-5; denied his Motion to Exclude, but granted him leave to re-file should the Wardens designate Dr. Andrew A. Monte as an expert in trihalomethanes (in addition to his designation as a uranium expert); and granted Plaintiff's Motion for Appointment of Counsel because of the complex medical issues raised in his Complaint, and directed the Clerk of the Court to seek appointment of pro bono counsel in accordance with Local Attorney Rule 15(f). [*Id.*].

On February 13, 2017, the Clerk of the Court entered a Notice of Pro Bono Appointment,

---

[3] This court also set March 11, 2016, as the deadline for Plaintiff to clarify whether he intended to pursue injunctive relief against the Wardens in this matter. [#99]. Mr. Duncan informed the court of his desire to do so on March 9, 2016. [#102].

designating four attorneys from the law firm of Hogan Lovells US, LLP as Mr. Duncan's civil pro bono counsel. [#165]. Then, on April 5, 2017, Plaintiff, through pro bono counsel, filed his Motion to (1) Withdraw Plaintiff's *Pro Se* Response to Defendants' Motion for Summary Judgment, (2) Reopen Limited Discovery, and (3) File a New, Fully Developed Response (the "Motion to Withdraw Response"). [#174]. The undersigned granted in part and denied in the Motion to Withdraw Response, deeming Plaintiff's *pro se* Response [#159] to Defendants' Motion for Summary Judgment withdrawn, and setting a Status Conference to discuss further scheduling needs. [#178]. At the May 4, 2017 Status Conference, this court reopened discovery for a limited period up to and including June 19, 2017, ordering Plaintiff to designate any expert(s) by May 18, 2017. *See* [#180]. In addition, this court granted Plaintiff an extension of time up to and including June 27, 2017, to respond to Defendants' Motion for Summary Judgment, given the Wardens' election to pursue the pending Motion rather than to file a new one after the reopened discovery. [*Id.*]. Defendants were granted until July 11, 2017, to file a Reply, if any. [*Id.*].

However, on June 15, 2017, Plaintiff's pro bono counsel filed a Motion to Withdraw as counsel of record, citing fundamental disagreements between Mr. Duncan and counsel as to how this matter should proceed. [#183]. During a Status Conference held on June 23, 2017, Mr. Duncan confirmed that he had discharged his attorneys and that he intended to proceed *pro se* in this matter. The undersigned granted the Motion to Withdraw and Plaintiff's request for an extension of time to file his *pro se* Response to Defendants' Motion for Summary Judgment. [#192].

On June 29, 2017, Mr. Duncan filed his *pro se* Response to Defendants' Motion for Summary Judgment. [#194]. Defendants did not file a reply. The Motion for Summary

5

Judgment is now ripe for Recommendation.

## STANDARD OF REVIEW

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem Coal Co., Inc.,* 41 F.3d 567, 569 (10th Cir. 1994). "A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 249 (1986)). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law. *Anderson,* 477 U.S. at 248–49; *Stone v. Autoliv ASP, Inc.,* 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. U.S. Postal Service,* 812 F.2d 621, 623 (10th Cir. 1987). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party. *Anderson,* 477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat. Bank of Ariz. V. Cities Service Com*, 391 U.S. 253, 289 (1968)).

"The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670–71 (10th Cir. 1998) (citing *Celotex,* 477 U.S. at 323). The movant can achieve this by pointing the court to a lack of evidence for the nonmovant

on an essential element of the nonmovant's claim. *Id.* at 671. Once the movant meets this initial burden, the nonmovant assumes the burden to put forth sufficient evidence to demonstrate the essential elements of the claim such that a reasonable jury could find in its favor. *See Anderson*, 477 U.S. at 248; *Simms v. Okla. Ex rel. Dep't of Mental Health & Substance Abuse Servs.,* 165 F.3d 1321, 1326 (10th Cir. 1999). Conclusory statements based merely on speculation, conjecture, or subjective belief are not competent summary judgment evidence. *See Bones v. Honeywell Int'l, Inc.,* 366 F.3d 869, 875 (10th Cir. 2004). The nonmoving party's evidence must be more than "mere reargument of [her] case or a denial of an opponent's allegation," or it will be disregarded. *See* 10B Charles Alan Wright, et al., Federal Practice and Procedure § 2738 at 356 (3d ed.1998).

## MATERIAL FACTS

The following facts are undisputed.[4] Mr. Duncan is presently incarcerated at SCF and has been since June 1999 through the operative period of time in this matter, i.e., 2008 through 2013. *See* [#147-1]. Warden Milyard was the warden at SCF from 2005 to 2011; he retired from CDOC in 2013. [#147-2 at 17:16-23, 45:5-9]. Warden Falk was warden at SCF from 2011 to 2015. [#147-3 at ¶ 2].

Uranium in the environment is predominantly Uranium$^{238}$, which is "far more stable than Uranium$^{235}$, which is utilized in bombs." [#147-5 at 1]. Colorado has a higher concentration of uranium in the soil compared to other states; consequently, it is present in the air, food, and water meaning Coloradans ingest uranium every day. [*Id.*] The Environmental Protection Agency ("EPA") has set the maximum contaminant level for uranium at 30 micrograms per liter, and the

---

[4] Though Mr. Duncan objects to all of the following facts, he fails to "direct the court to *facts* which establish a genuine issue for trial[,]" and, instead, relies on conclusory allegations without "any significant probative evidence" to support such allegations. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995) (internal quotations and citations omitted).

maximum contaminant level for trihalomethanes at 80 micrograms per liter. [*Id*. at 1-2; #147-10 at 3].

On February 21, 2008, the City of Sterling published a notice indicating that, in 2007, its water exceeded 30 micrograms of uranium per liter with an average level of 43 micrograms per liter. [#147-9]. The notice also indicated, "<u>this is not an emergency</u>." [*Id.* (emphasis in original)]. From 2008 through 2012, the City of Sterling's water exceeded the maximum contaminant level for uranium, with average levels ranging from 31 micrograms per liter to 54 micrograms per liter. [#147-10 at 3; #147-11 at 3; #147-12 at 7; #147-13 at 4; #147-14 at 7-9]. From 2008 through the first quarter of 2010, SCF's water tested below the maximum contaminant level for uranium. *See* [#147-15; #147-16]. However, the water at SCF exceeded the maximum contaminant level for uranium from the second quarter of 2010 through the first quarter of 2011. *See* [#147-15; #147-16; #147-21; #147-27]. The average readings ranged from 30.49 to 33.28 micrograms per liter. [#147-15; #147-16 at 10-26]. Annual averages read below 30 micrograms per liter. [#147-15]. During this time, SCF's water exceeded the micrograms per liter in ten separate tests. [*Id.*] During the third quarter of 2013, the average uranium levels in the water at SCF exceeded the maximum contaminant level by 1.6 micrograms per liter. [*Id.*].

Relatedly, from 2011 to 2013, the average level of total trihalomethanes in the City of Sterling's water exceeded the maximum contaminant level of 80 micrograms per liter. [#147-13; #147-14; #147-20]. The average readings during this time ranged from 90.43 to 123 micrograms per liter. *See* [#147-13; #147-14; #147-20]. However, during this same time, SCF's water did not exceed an average of 80 micrograms per liter of trihalomethanes. *See* [#147-21; #147-22; #147-23].

8

Warden Milyard first learned about the excess uranium in the City of Sterling's water during a prison management team meeting in spring 2008, when they discussed the administrative notice circulated by the City. [#147-2 at 25:23-25; 26:9-25; 37:20-38:3]. Soon thereafter, Warden Milyard discussed the matter with his direct supervisor, the Deputy Director of Prisons. [*Id.* at 27:8-28:2]. Warden Falk first learned about the excess uranium in the City of Sterling and SCF's water supply when he received a memorandum from CDOC headquarters entitled, "Important Information About Your Drinking Water" in August 2013. [#147-3 at ¶ 4; #147-7]. In early 2008, the CDOC's Director of Prisons informed Warden Milyard that the CDOC's Facility Management Services would monitor the situation and identify possible solutions. [#147-2 at 27:8-19]. SCF's physical plant manager became the SCF point-person for the water contamination issue and primarily worked with CDOC's Facility Management Services on water testing and remediation. [*Id.* at 31:12-14, 53:2-17, 60:6-16, 65:3-8]. SCF's physical plant manager primarily communicated with the CDOC's Facility Management Services about the uranium levels in SCF's water, and Wardens Milyard and Falk's involvement was limited to identifying locations to dispense alternate drinking water for inmates and to identify processes for receiving bulk supplies of water for SCF. *See* [*id.* at 28:7-12, 53:22-54:13, 60:6-16; #147-3 at ¶¶ 11-12; #147-8 at ¶ 5].

In 2008, John Gillogley, the Special Projects Manager at CDOC's Facility Management Services, was assigned to ascertain how the City of Sterling's water quality problems might affect the water supply at SCF; he contacted the Colorado Department of Public Health and Environment ("CDPHE"), conducted on-line research, met with the City of Sterling's City Manager, and talked with an engineering firm retained by the City of Sterling to address the water quality issues. [#147-8 at ¶ 4]. However, CDOC did not begin exploring remedial options

until 2010. [#147 at 8, ¶¶ 30, 32]. These options included: (1) developing a system to store, bottle, and distribute bulk water that would be transported to SCF from Fort Morgan; (2) purchasing bottled water; and (3) developing an adsorption system, a reverse osmosis filtration system, and a bulk-water storage and distribution system. [#147-8 at ¶ 6, 7]; *see also* [#147-2 at 28:10-18, 30:1-8, 49:22-50:25, 65:23-66:5]. Mr. Gillogley explored remedial options from 2010 to 2011 until SCF's water samples no longer contained excess uranium, but renewed his efforts in 2013 when excess uranium was again detected in SCF's water. [#147-8 at ¶ 7]. As of 2013, CDOC knew that the City of Sterling was building a new water treatment plant capable of removing the excess uranium. [*Id.*]. The new water treatment plant became operational in November 2013, and the City of Sterling's water contained 9.1 micrograms per liter of uranium. [#147-17; #147-18; #147-19].

On August 22, 2013, the CDOC informed inmates that it was providing them with drinking water delivered from Canon City, Colorado. [#147-24]. This notice informed inmates that the CDPHE "believes that uranium is not considered to be a contaminant associated with health effects from short-term exposure at the recently observed levels," but that some people who consume such levels over "many years" may have an increased risk of cancer or kidney toxicity. [*Id.*]. Canon City's water consistently tested below the maximum allowable levels of uranium. [#147-25]. The CDOC continued to ship Canon City water to SCF up until the City of Sterling's new water treatment plant began operations in November 2013. The water processed by the new plant met the EPA's requirements. [#147-8 at ¶ 9]. The CDOC ended the alternate drinking water program on March 10, 2014. [*Id.*] In 2014 and 2015, the water in the City of Sterling contained an average uranium concentration of around 5.56 micrograms per liter. [#147-17 at 4; #147-19 at 5].

**ANALYSIS**

The court now turns to Plaintiff's remaining Eighth Amendment claim. The treatment a prisoner receives in prison and the conditions under which he is confined are subject to Eighth Amendment scrutiny. "The Eighth Amendment's prohibition on cruel and unusual punishment does not mandate comfortable prisons, and conditions imposed may be restrictive and even harsh." *DeSpain v. Uphoff*, 264 F.3d 965, 973 (10th Cir. 2001) (citations and internal quotations omitted). However:

> when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being.... The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment....

*DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 199–200 (1989). To prevail on a conditions of confinement claim under the Eighth Amendment, an inmate must establish that the condition complained of is "sufficiently serious" to implicate constitutional protection, and that prison officials acted with "'deliberate indifference' to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). These requirements of proof are known as objective and subjective components of the claim. Essentially, in the course of proving a claim challenging conditions of confinement, a plaintiff must "establish that it is contrary to current standards of decency for anyone to be so exposed against his will and that prison officials are deliberately indifferent to his plight." *Helling*, 509 U.S. at 34.

To satisfy the objective requirement, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *DeSpain*, 264 F.3d at 971 (quoting

*Farmer*, 511 U.S. at 834). The evaluation of a conditions of confinement claim requires "a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused" by exposure to the condition, as well as an assessment of "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling*, 509 U.S. at 36 ("the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate") (emphasis in original). In reviewing this component of the claim, the court necessarily relies on the particular facts of each situation, including the "circumstances, nature, and duration" of the challenged condition. *DeSpain*, 264 F.3d at 974. While not dispositive, the length of exposure to the hazardous condition is "of prime importance." *Id.* "[T]he severity and duration of deprivations are inversely proportional, so that minor deprivations suffered for short periods would not rise to an Eighth Amendment violation." *Id.* (citations omitted). Conversely, exposure to a hazardous condition that lasts over a significant period of time may give rise to the level of a constitutional violation. *See id.*

Defendants argue that Mr. Duncan must show he was exposed to unreasonably high levels of uranium and trihalomethanes in the drinking water to demonstrate he was subjected to a sufficiently serious condition. [#147 at 14]. This court declines to adopt a standard that *per se* requires an "unreasonably high level of trihalomethanes and uranium." Notably, when considering a similar issue in the case of *Cary v. Hickenlooper*, the Tenth Circuit stated that "[n]othing in the Complaint indicates that Mr. Cary has personally been exposed to water containing excess uranium at SCF for many years *or* at highly toxic levels, *or* (given the availability of an alternate water source and a new water treatment facility) that he is likely to face such long-term exposure in the future." *Cary v. Hickenlooper*, 673 F. App'x 870, 875 (10th

Cir. 2016) (unpublished) (emphasis added). The Tenth Circuit's use of the disjunctive indicates that a plaintiff can satisfy the "sufficiently serious" component of the claim not only by proving that he was exposed to water with highly toxic levels of uranium and trihalomethanes, but also by proving that he was exposed to water containing excess uranium and trihalomethanes for a number of years <u>or</u> that he is likely to face long-term uranium or trihalomethanes exposure in the future. As discussed below, Plaintiff has not established a genuine issue of material fact that he is currently facing long-term trihalomethanes and uranium exposure, or he is likely to face long-term exposure in the future.

Mr. Duncan has been incarcerated at SCF since June 1999 to present. *See* [#147-1]. During this period, SCF's water tested over the EPA's uranium maximum contaminant level on eight occasions. *See* [#147-15]. And, while the City of Sterling's water contained excess trihalomethanes between 2011 and 2013, SCF's water never exceeded the EPA's 80 microgram per liter maximum contaminant level. *See* [#147-13; #147-14; #147-20; #147-21; #147-22; #147-23]. Nonetheless, it is undisputed that Mr. Duncan was exposed to water that exceeded the EPA threshold for uranium in water for a number of years, and was exposed to trihalomethanes. Accordingly, the operative inquiry then becomes whether there is a genuine issue of material fact that Mr. Duncan's exposure to trihalomethanes and excess uranium reached such a level and lasted for such duration of time so as to result in an objective, substantial risk of harm. *See DeSpain*, 264 F.3d at 974 (recognizing courts may consider severity of adverse condition and duration of exposure according to a sliding scale).

Defendants contend that the levels of trihalomethanes and excess uranium and the duration of Mr. Duncan's exposure do not give rise to a condition of confinement that is sufficiently serious. *See* [#147 at 15-16]. While the Parties offer different interpretations of the

significance of the exposure to trihalomethanes and excess of uranium, *compare* [#1 at 12-15; #194] *with* [#147 at 15-16], the data collected and the timing of collection are undisputed, as both Parties rely upon the same reports. *See generally* [#147-10 through #147-14; #147-16 through #147-22]. These reports demonstrate that, on many occasions, tests of the City of Sterling's water revealed uranium in excess of the EPA threshold of 30 micrograms per liter, ranging from 30.49 to 33.28 micrograms per liter. Reports published by the City of Sterling stated that from 2008 through 2012, the city's water exceeded the maximum contaminant level for uranium with average levels ranging from 31 to 54 micrograms per liter. [#147-10 through #147-14]. Those reports also identified an excess of trihalomethanes, ranging from 90.43 to 123 micrograms per liter from 2011 to 2013. *See* [#147-13; #147-14; #147-20].

Defendants offer the expert opinion of Andrew A. Monte, M.D., to support their argument that the amount by which the uranium exceeded the EPA threshold was not dangerous. *See* [#147-5 at 1-2]. Dr. Monte opines that, notwithstanding the threshold of 30 micrograms per liter, the EPA and the World Health Organization have established "a safe total daily intake" of 60 micrograms per liter per day, based on "several cohorts exposed to very high levels of uranium for many years." [*Id.*] Additionally, he opines that in one study, "concentrations up to 845 mcg/L for up to 15 years were not associated with any increased rate of cancer," and there has been no "increased risk of leukemia…stomach cancer…, or urinary organ cancers…associated with long-term uranium exposure." [*Id.* at 2].

Relatedly, Defendants argue that the levels of trihalomethanes in SCF's water never exceeded the 80 microgram per liter maximum contaminant level. [#147 at 15]. Because this fact is undisputed, this court agrees with Defendants that Plaintiff fails to create a genuine issue of material fact that his exposure to trihalomethanes posed a substantial risk of serious harm.

14

Thus, this court focuses solely on Plaintiff's arguments concerning his uranium exposure.

Mr. Duncan in turn argues that he suffers from thyroid issues, kidney injuries and pain, liver damage, as well as immune system and nervous system ailments—all allegedly caused by Defendants forcing him to eat polluted food and drink polluted water. *See* [#1 at 12-15; #164; #164-1; #194 at 12, 18-19; #194-1]. However, though Mr. Duncan's medical records corroborate some of his alleged symptoms,[5] noticeably absent from those records is any opinion or indication that his ailments were caused by his exposure to trihalomethanes and/or uranium. *See generally* [#164-1]. Moreover, Dr. Monte opined that, although Mr. Duncan's past medical history revealed "chronic obstructive pulmonary disease, osteoarthritis, alcoholic cirrhosis, chronic back pain, hypertension, and hypothyroidism[,]" uranium exposure "is not associated with organ injury of the thyroid, liver, immune system, nervous system, spine, or endocrine system at [the] exposure levels [in this case]." [#147-5 at 4]. In Dr. Monte's opinion, Plaintiff's medical ailments are the result of aging, not uranium exposure, and that any abnormalities with Mr. Duncan's kidneys occurred *after* remediation efforts lowered uranium levels below the maximum contaminant level. [*Id.* at 4]. Mr. Duncan fails to proffer any evidence to refute this opinion.

In viewing the evidence before it in a light most favorable to Plaintiff, this court respectfully concludes that Mr. Duncan has failed to marshal sufficient evidence to avoid summary judgment. Plaintiff simply has not established a triable issue as to the *seriousness* of the potential harm and the likelihood that injury to his health was *caused* by the exposure to excess uranium (or trihalomethanes as noted above) that he experienced. Once Defendants came forward with testimony from Dr. Monte that the symptoms of which Mr. Duncan complained

---

[5] *But see, e.g.*, [#164-1 at 6, 8, 9, 13, 25 (medical records from 2012 and 2013, indicating that on several occasions that Plaintiff's kidneys looked normal, and that his liver, pancreas, and gallbladder were unremarkable)].

were not caused by exposure to excess levels of uranium, it was incumbent upon Mr. Duncan to offer scientific and/or technical evidence that the levels of uranium in conjunction with the duration of exposure were sufficient to cause the harms he alleged, including any injury to his kidney function. Indeed, in considering whether uranium exposure led to an increased cancer risk in the toxic tort context, courts have explained that:

> It is not enough for a plaintiff to show that a certain chemical agent sometimes causes the kind of harm that he or she is complaining of. At a minimum,…there must be evidence from which the factfinder can conclude that the plaintiff was exposed to levels of that agent that are known to cause the kind of harm that the plaintiff claims to have suffered. We do not require a mathematically precise table equating levels of exposure with levels of harm, but there must be evidence from which a reasonable person could conclude that a defendant's emission has probably caused a particular plaintiff the kind of harm of which he or she complains before there can be a recovery.

*Cano v. Everest Minerals Corp.*, 362 F. Supp. 2d 814, 824 (W.D. Tex. 2005) (citations omitted).

The court's consideration of any effects of excess uranium and trihalomethanes in water upon Mr. Duncan must be based on scientific, technical, or other specialized knowledge, because such information is simply not within the knowledge base of a layperson. It is insufficient at this stage for Plaintiff to rely solely on conclusory, unsubstantiated allegations to create a genuine issue of material fact as to whether his exposure to uranium and trihalomethanes were the cause of his medical issues. *See Daniels v. Gilbreath*, 668 F.2d 477, 488-89 (10th Cir. 1982) (noting that causation is a necessary element in any § 1983 claim). This is especially true in light of Dr. Monte's expert opinion that there are other, non-uranium related causes for Plaintiff's ailments. While Plaintiff theoretically could have adduced information from Dr. Monte that satisfied his burden and obviated a need to retain his own expert, neither he nor his pro bono counsel did so.

Thus, the court's inquiry begins and ends at "a scientific and statistical inquiry" into the seriousness of the potential harm of ingesting excess uranium and trihalomethanes through

16

drinking water and the likelihood that the excess of both will cause injury to health, and specifically, caused injury to Mr. Duncan's health. *Helling*, 509 U.S. at 36. While Defendants' failure to notify Mr. Duncan and other inmates of the excess uranium in the water until August 2013 is troubling, their failure alone cannot satisfy the objective prong.

Importantly, however, this court's conclusion *supra*, does not suggest that Plaintiff's medical ailments or exposure are *per se* not sufficiently serious, or that Plaintiff was required at this stage to affirmatively refute Dr. Monte's opinions and prove that his injuries were caused by his exposure. Rather, this court concludes that without expert opinions (either Dr. Monte's own during cross-examination or those of an affirmative expert) to rebut the expert testimony offered by Defendants, Mr. Duncan has failed to come forward with sufficient evidence from which a jury could conclude that his injuries were attributable to his exposure to trihalomethanes and excess uranium. Having concluded that Plaintiff has not established a genuine issue of material fact as to the objective prong, the court does not reach the subjective prong regarding his Eighth Amendment claim.

## CONCLUSION

Therefore, for the reasons stated herein, this court respectfully **RECOMMENDS** that:

(1) Defendants' Motion for Summary Judgment [#147] be **GRANTED**;

(2) Plaintiff's remaining Eighth Amendment claim be **DISMISSED with prejudice**; and

(3) Final Judgment be entered in favor of Defendants Milyard and Falk and against Plaintiff.[6]

---

[6] Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that

17

**IT IS FURTHER ORDERED** that:

(1)　　A Copy of this Recommendation shall be sent to the following, marked as legal mail:

James Roger Duncan
#41762
Sterling Correctional Facility (SCF)
P.O. Box 6000
Sterling, CO 80751

DATED: July 13, 2017                                BY THE COURT:

                                                    s/Nina Y. Wang_____
                                                    Nina Y. Wang
                                                    United States Magistrate Judge

---

does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling). *But see Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).